UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

NICOLE LOGAN et al.,

        Plaintiffs,

    v.

CITY OF PULLMAN, et al.,

        Defendants.

No. CV-04-214-FVS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY**

    **BEFORE THE COURT** is the Defendants' Motion for Partial Summary Judgment Re: Qualified Immunity, Ct. Rec. 55. Plaintiffs are represented by Darrell Cochran and Thaddeus Martin. Defendants are represented by Andrew Cooley, Stewart Estes, and Kimberly Waldbaum. Defendants Ruben Harris, Don Heroff, Dan Hargraves, and Andrew Wilson, each a member of the Pullman Police Department, move for partial summary judgment on qualified immunity. The Court has reviewed the memoranda submitted by both parties and the entire file and is fully informed.

I.    **OBJECTIONS TO EVIDENCE**

    In opposition to Defendants' Motion for Partial Summary Judgment Re: Qualified Immunity (hereinafter Defendants' Motion), Plaintiffs submitted Exhibits A through P as attachments to the declaration of Plaintiffs' counsel Loren Cochran. Defendants object to Exhibits C, E, F, H, I, and P, on the basis of improper

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 1

authentication and hearsay.  Additionally, Defendants object to the testimony of Dr. Albert Black and Dr. Keppel's report.

A trial court can only consider admissible evidence in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).  "Authentication is a condition precedent to admissibility, and this condition is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  *Orr*, 285 F.3d at 773 (internal quotations omitted); Fed.R.Evid. 901(a).  The Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."  *Orr*, 285 F.3d at 773.  "In a summary judgment motion, documents authenticated through personal knowledge must be attached to an affidavit that meets the requirements of Fed.R.Civ.P. 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."  *Id.* at 773-74.  Rule 56 requires that affidavits be made on personal knowledge and that the affiant be competent to testify to the matters stated therein.  Fed.R.Civ.P. 56(e).

### Exhibit E

Exhibit E purports to be a Certificate of Occupancy for the Top of China Restaurant, and was submitted by Plaintiffs as proof that the building's maximum capacity was 360.[1]  This document appears to

---

[1] Defendants argue the building was packed twice to its legal capacity, but Plaintiffs dispute this claim.  Although the actual number of people inside the Top of China Restaurant and Night Club on the night in question is disputed, this exhibit does not present a material issue of fact because it is not necessary for the Court to determine the number of people present

be signed by Lawrence W. Waters, a City of Pullman business official.  Because Plaintiffs attempted to introduce Exhibit E by attaching it to Mr. Cochran's declaration, Rule 56(e) requires Mr. Cochran have personal knowledge of the Certificate.  *Orr*, 285 F.3d at 777.  Mr. Cochran's affidavit stating that Exhibit E is a "true and correct copy" does not provide authentication because he does not have personal knowledge of the Certificate; he did not witness Mr. Waters sign the Certificate and he is not familiar with Mr. Water's signature.  Since Plaintiffs failed to submit an affidavit from Mr. Waters stating he signed this Certificate of Occupancy and he is authorized to sign as an official for the City of Pullman, Exhibit E was not properly authenticated.  Therefore, the Court sustains the Defendants' objection and excludes Exhibit E.

Had Plaintiffs submitted Exhibit E by attaching it to an exhibit list instead of Mr. Cochran's declaration, the alternative means to authentication permitted by Federal Rules of Evidence 901(b) (providing ten non-exclusive approaches to authentication) and 902 (providing twelve categories of self-authenticating documents for which no extrinsic evidence of authenticity is required) would have to be considered.  *Orr*, 285 F.3d at 378 n. 24 ("Federal Rule of Civil Procedure 56(e) does not require that all documents be authenticated through personal knowledge when submitted in a summary judgment motion.  Such a requirement is limited to

at the club on the evening in question or whether this number exceeded the legal capacity for the building in order to decide the issue of qualified immunity.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 3

situations where exhibits are introduced by being attached to an affidavit. ... For instance, documents attached to an exhibit list in a summary judgment motion could be authenticated by review of their contents if they appear to be sufficiently genuine. *See* Fed.R.Evid. 901(b)(4) (authenticity may be satisfied by the appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.")). However, Plaintiffs did not do so and therefore the Court cannot consider whether Exhibit E is self-authenticating under Federal Rule of Evidence 902.[2]

**Exhibit F**

Exhibit F purports to be a memorandum from Pat Wilkins to John Sherman, City Supervisor. This exhibit suffers from the same defects as Exhibit E. Because Plaintiffs attempted to introduce Exhibit F by attaching it to Mr. Cochran's declaration, Rule 56(e) requires Mr. Cochran have personal knowledge of the memo. *Orr*, 285 F.3d at 777. Mr. Cochran's declaration stating that Exhibit F is a

---

[2] Even if the Court considered whether Exhibit E was a self-authenticating document under Fed.R.Evid. 902(2), it would still be inadmissible. Exhibit E does not contain an official seal so it is not self-authenticating under Rule 902(1). Rule 902(2) provides for self-authentication of domestic public documents that do not bear a seal, but this rule requires two levels of authenticating indicia appear on the document. Exhibit E meets the first requirement because it purports to bear the signature of an officer of the City of Pullman in his official capacity. However, Exhibit E does not bear any certification, under seal, of a public officer, who can attest that the signing officer (Lawrence Waters) has the official capacity he purports to have and that his signature is genuine. Therefore, Exhibit E does not meet the requirements of a self-authenticating document.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 4

"true and correct copy" does not provide authentication because Mr. Cochran does not have personal knowledge of the memo; he neither wrote the memo nor witnessed Pat Wilkins write the memo. This exhibit has not been authenticated because Plaintiffs failed to submit an affidavit from Pat Wilkins stating he wrote this memo. Therefore, Defendants' objection is sustained and Exhibit F shall be excluded.

**Exhibit I**

Exhibit I purports to be a transcript of a call placed by Christopher Lee from the Top of China Restaurant on the night of the incident in question, to Wendy Berrett, a 911 operator. The exhibit is accompanied by an affidavit from Heidi Kay, certifying Exhibit I is a "true and accurate copy" of the tape she transcribed. While this is sufficient to authenticate the transcript as being a copy of the actual tape Ms. Kay transcribed, it is insufficient to authenticate the telephone conversation which was transcribed.

Federal Rule of Evidence 901(b)(6) provides for authentication of telephone conversations. In order to authenticate a telephone call under Rule 901(b)(6), there must be testimony that a call was made to an assigned number and circumstantial evidence identifying the person who answered the call as the one who was intended to be called. Although Heidi Kay's affidavit identifies the copy of the transcript (Exhibit I) as that of a recorded 911 call, neither the transcript nor the affidavit identify the date, the time called, or the number from which the 911 call was placed. Furthermore, Mr. Cochran's declaration cannot authenticate this exhibit because he is

not a person through whom the evidence can be admitted.  *Orr*, 285 F.3d at 774.  Therefore, Defendants' objection is sustained and Exhibit I is excluded.

**Exhibit P**

Exhibit P purports to be the first two pages of the "Police Chemical Agents Manual" from the International Association of Chiefs of Police, Inc.  Because Plaintiffs attempted to introduce Exhibit P by attaching it to Mr. Cochran's declaration, Rule 56(e) requires he have personal knowledge of the document.  *Orr*, 285 F.3d at 777.  However, Mr. Cochran does not have personal knowledge sufficient to authenticate this exhibit.

This exhibit should have been presented in an exhibit list, not as an attachment to the declaration of Mr. Cochran, because it would probably be self-authenticating under Federal Rule of Evidence 902(5) (books, pamphlets, or other publications purporting to be issued by public authority).  Nevertheless, it is not necessary for the Court to determine whether to exclude Exhibit P because it is not cited in Plaintiffs' Statement of Facts or Memorandum.

**Exhibit H**

Exhibit H is a newspaper article from the Washington State University student newspaper, *The Daily Evergreen*, reporting the effects of O.C. from the perspective of police intern McAvoy Shipp.  Although a newspaper article is self-authenticating under Federal Rule of Evidence 902(6), it is hearsay under Federal Rule of Evidence 801(d)and is inadmissible unless it falls within an established exception to the rule against hearsay.  *United States v.*

*Bellucci*, 995 F.2d 157, 160 (9th Cir. 1993) ("The fact that a document may be self-authenticating does not render it admissible if it is hearsay in the absence of a recognized exception to the rule against hearsay."). As the proponent of the hearsay evidence, Plaintiffs bear the burden of proving its admissibility. *Id.* The only exception which might apply to this article is the residual hearsay exception found in Federal Rule of Evidence 807. However, Plaintiffs have not set forth any premise upon which the Court should conclude Exhibit H falls within this hearsay exception. In fact, Plaintiffs failed to respond to Defendants' hearsay objection; Plaintiffs only responded to Defendants' authentication objection. Therefore, the Defendants' objection is sustained and Exhibit H is excluded as hearsay.

**Exhibit C**

Exhibit C purports to be oleoresin capsicum spray[3] instructor materials and was submitted by Plaintiffs to support their statements regarding the effects of O.C. Two of the pages found within Exhibit C are letters which have not been authenticated by the purported authors of the letters. Had Exhibit C been submitted in an exhibit list, rather than as an attachment to Mr. Cochran's declaration, the exhibit might have been self-authenticating under Federal Rule of Evidence 902(5) (official publications) or 902(6) (newspapers and periodicals). However, because Plaintiffs attempted to introduce Exhibit C by attaching it to Mr. Cochran's declaration,

[3] Oleoresin capsicum spray is also known as pepper spray and is referred to as O.C. hereinafter.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 7

Rule 56(e) requires Mr. Cochran have personal knowledge of the documents. *Orr*, 285 F.3d at 777. Since Mr. Cochran does not have personal knowledge of the letters or the instructor materials, Mr. Cochran's declaration stating that Exhibit C is a "true and correct copy" of documents received through public disclosure requests to the City of Pullman does not authenticate Exhibit C. Moreover, the two letters within Exhibit C are hearsay and Plaintiffs have not set forth any evidence that the letters fall within a recognized exception to the rule against hearsay. Consequently, the Defendants' objection is sustained and Exhibit C is excluded.

**Dr. Albert Black**

Plaintiffs' Memorandum submit the testimony of their expert, Dr. Albert Black, a sociologist with the University of Washington who concluded the Pullman Police acted in an overtly hostile and racially discriminatory manner during the incident in question. Defendants object to this testimony on grounds of relevance under Federal Rule of Evidence 402.

Dr. Black's declaration states he was retained to determine whether there was "scientifically verifiable elements of racial bias, discrimination and prejudice with regard to the September 8, 2002 incident...." Decl. Dr. Black. However, Dr. Black's opinion testimony on that issue is not relevant to the issue before the Court because the subjective state of mind of the individual officers is irrelevant in determining whether they are entitled to qualified immunity. Further, the Defendants have not moved for summary judgment with respect to Plaintiffs' race claims. Therefore,

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 8

Dr. Black's opinion testimony does not present an issue of material fact on the question of qualified immunity and is excluded as irrelevant.

**Dr. Robert Keppel's Report**

Plaintiffs' Memorandum and Statement of Material Facts both rely on the report of Dr. Robert Keppel as evidence of what took place at the Top of China Restaurant and Attic Nightclub during the incident in question. Defendants object, arguing everything relied upon by Plaintiffs from Dr. Keppel's report is hearsay and inadmissible under Federal Rule of Evidence 801(c). Defendants further argue the report has not been properly authenticated by a declaration from Dr. Keppel, as required by Federal Rules of Evidence 901 and 902.

Dr. Keppel was not present on the night in question and his report relies entirely on the accounts of others to establish the details of the events occurring on the night in question. Because Dr. Keppel has no personal knowledge of the incident in question, the facts in his report are hearsay and therefore inadmissible in a motion for summary judgment unless an established exception to the rule against hearsay applies to the report. As the proponent of the hearsay evidence, Plaintiffs bear the burden of proving its admissibility. *Bellucci*, 995 F.2d at 160. In response to Defendants' objection, Plaintiffs state: "Defendants' objections to the facts contained in Dr. Keppel's report are not well taken. It is well established that experts may rely upon evidence that might not otherwise be admissible. *See Fed. R. Evid.* 703, 705."

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 9

Although Federal Rule of Evidence 703 and 705 allow experts to rely on facts that might otherwise be inadmissible to formulate their expert opinions, neither Rule 703 or Rule 705 permit expert reports to automatically become proof of the facts underlying the expert's opinion.  Therefore, Plaintiffs cannot rely on Dr. Keppel's report as proof of material facts in opposition to Defendants' motion.  To the extent the report details the events occurring on the night in question, the report is hearsay, and the Plaintiffs have not shown that an exception to the rule against hearsay applies.  Moreover, Dr. Keppel's report has not been properly authenticated and authentication "is a condition precedent to admissibility." *Orr*, 285 F.3d at 773.  Therefore, for the foregoing reasons, the Court sustains the Defendants' objection and the Court will not consider any portions of Plaintiffs' Memorandum relying on Dr. Keppel's report for proof of material facts.

**Conclusory Statements**

Defendants object to numerous statements in Plaintiffs' Memorandum as unsupported conclusory allegations.  The Court did not consider any inadmissible evidence or unsupported conclusory allegations in setting forth the facts or in deciding Defendants' Motion for Partial Summary Judgment Re: Qualified Immunity. Therefore, the Court determines it is unnecessary to rule on the admissibility of each allegedly conclusory statement objected to by Defendants.

//

//

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 10

**II.   BACKGROUND**

The undisputed facts viewed in the light most favorable to Plaintiffs are as follows.  On the evening of September 7, 2002, the Omega Psi Phi (Omegas), an African American male fraternity at Washington State University, hosted a social function at the Top of China restaurant and Attic nightclub in Pullman, Washington.  The restaurant is located on the first floor of the building and the nightclub is located on the second floor of the building.  By all accounts, the evening ran smoothly without incident until some time after 1:00 a.m. on September 8, 2002, when an altercation arose on the dance floor (second floor) between the Omegas and a rival fraternity, the Kappa Alpha Psi (Kappas).  When the Omegas took the dance floor while their anthem, "Atomic Dog", was playing, a member of the Kappas began to taunt the Omegas with a chant from the Kappas fraternity.  Plaintiff Alvin Tolliver walked over to Plaintiff Davis and slapped him in front of his friends.  Thereafter, the level of physical interaction that occurred on the dance floor is disputed. It is referred to as a verbal argument, "mouth talking", an altercation, and a small quarrel.  Regardless of the level of contact that occurred upstairs, it is undisputed that the argument continued downstairs while the students returned to the dance floor on the second floor.  Plaintiff Ira Davis testified during his deposition that he fell down the stairs with Plaintiff Quincy Mercer, non-party Jones, Aaron, Reggie, and an unidentified Omega. They all ended up at the bottom of the stairs in a pile.

According to Plaintiff Shikita Trahan, who was downstairs at

the time, six Omegas then squared off against seven Kappas downstairs. She stated in her deposition that Plaintiff Alvin Tolliver (an Omega) was fighting Corey (a Kappa). They were "hitting each other in the face and chests. And then two more guys jumped in." She further stated that Plaintiff Tolliver and Corey were hitting each other so hard that you could hear them hitting each other. Then, one of the Omegas, Plaintiff Quantavian (Trey) Wilson, picked up a wooden chair "over his head and he threw it."

Non-party witness Christopher Lee, an employee at the Top of China, also saw people picking up chairs and turning over tables. Mr. Lee described the violence as follows:

> At first it was just like these people are really fighting and stuff, and then I saw the chair thing I was just like, these people are seriously in trouble because you know, like with a regular fight or something maybe you can break it up or talk some people out of it, but with this when they started getting into it, someone hitting with a chair, I was just like this is not going to end pretty.

At that point, Mr. Lee called the police.

> I called the police, and I was like you guys need to get over here because I'm not going to stop this...There's people fighting...and it's going to get ridiculous because they're blocking one of the two great exits at the nightclub. They were blocking one of them, and people were trying to get out. So there was people fighting and people trying to go around them, and there were some innocent people getting hurt trying to get out of this club because of whoever was fighting. And I don't even know the number, but it was enough to clog up the stairs and stop people from actually exiting.

Mr. Lee described the scene, as he was waiting for the police to arrive, as "mayhem", "mass chaos", and "WWF".

Damon Golden (the disc jockey) and non-party witness Rachel Householder (assistant to Damon Golden) provided a different

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 12

description of the events from that provided by Mr. Lee and
Plaintiff Shikita Trahan.  When asked what he saw when he went
downstairs following the altercation, Mr. Golden said it did not
look as though a fight had taken place and he didn't think tables
had been thrown.  However, Mr. Golden did not come downstairs until
after the police broke up the fight.  Ms. Householder stated she did
not see any punches thrown but it appears this statement was made in
reference to the quarrel upstairs.[4]  With respect to the downstairs
dispute, Ms. Householder stated:  "When the group was in the first
floor lobby, I started walking back upstairs as they were moving
toward the door to leave.  While I was walking up the stairs, I
heard some shouting behind me.  I turned around and started to walk
back to the lobby.  I observed police officers outside the club and
was wondering why they were present because the situation was under
control."

Defendant Officer Heroff described arriving at the Top of China
and witnessing "a melee involving six or eight people and
approximately 20-30 people in the lower dining area.  People were
kicking and punching each other and it was very loud from their
yelling at each other."  He also saw tables "lying upside down."
Defendant Officer Hargraves described the scene as a "complete
melee."  Upon arriving at the Top of China, Defendant Officer Harris
observed people "fighting violently."  They were "very close

---

[4] Even if Ms. Householder was referring to the first floor,
the fact that she did not see punches thrown does not mean a
fight did not take place.

together throwing punches and kicks and just about every other kind of fighting motion, including a couple people that were lifted off the ground and being thrown."

Defendant Officers Hargraves, Heroff, and Harris each sprayed O.C. toward the group of individuals who were actively fighting, stepped outside to allow the O.C. to take effect, and then re-entered to make arrests and quell the fighting. Defendant Officer Harris "sprayed pepper spray directly into the center of that group [that was fighting.]" Defendant Officer Wilson, the fourth officer to arrive, did not discharge pepper spray because he arrived after the other officers had used O.C. Some of the males were handcuffed and remained inside the building for at least twenty minutes before Officers Wilson and Sanders removed them from the building.

According to Katie Farrell, a witness who saw the incident take place through an apartment window across the street, the officers did not turn their police sirens on when they arrived at the Top of China. She also stated that at least two of the three police cars she saw were unmarked. Additionally, it is undisputed that the Defendant Officers did not use the police public announce system to address the crowd until after they sprayed O.C.

According to Ms. Householder, the "first thing the officer did was to open up the door slightly, stick his hand through the crack he created in the doorway and sprayed pepper spray...." This testimony is consistent with Mr. Lee's testimony that the officer "opened the door, and it was just like spray because the initial fight was...less than five feet from [the officers]." Plaintiff

Shikita Trahan stated that the officers were spraying in a constant stream into the air as they moved into the building and toward the stairs.  However, she also stated she did not see whether there were people in front of the officers when they was spraying.

It is undisputed that the Defendant Officers did not go upstairs and intentionally use O.C. on anyone other than those individuals downstairs.  However, the O.C. immediately diffused through the building, exposing those who were upstairs on the dance floor.  Celena Gonsalves stated that it was about fifteen minutes after the people in the altercation on the dance floor went downstairs that she started to feel the effects of the O.C.  After the O.C. drifted upstairs to the dance floor, panic followed, creating somewhat of a stampede as people were tripping over one another trying to come down the stairs in an attempt to get out of the building.  The situation became one of mass confusion.  People were coughing, gagging, vomiting, and having trouble breathing because of the O.C..[5]  Some of the officers were also affected by the O.C.

---

[5] Celena Gonsalvez's testimony describes an experience similar to the majority of Plaintiffs' experience:  "I was upstairs with music and having a good time, and then all of a sudden, all of our throats started burning.  Our eyes were burning.  People started passing out.  Girls and boys both were passing out, and that's kind of–I saw people vomiting.  I saw all kinds of stuff.  I saw people scurrying.  Very–very scared faces on some people's faces.  It was–it was pretty scary."  After the incident, Plaintiff Damon Arnold went to the hospital and registered an 80% oxygen level.  He was fatigued for days and sought follow-up treatment.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 15

Plaintiffs contend Defendants took deliberate actions to keep the innocent people inside the building. In support of this statement, Plaintiffs submitted the declarations of Plaintiff Celena Gonsalves and Willie Brent. Plaintiff Celena Gonsalves stated "the police officers shut off and blocked the way I was going and I had to turn around. I was one of the last persons to get out for fresh air." Plaintiff Willie Brent stated some of the officers were "suggesting" that people stay inside. However, Willie Brent further stated that he was not blocked or prevented from leaving the building.

Plaintiffs argue O.C. was not the only chemical used by Defendants. In support of this argument, Plaintiffs submit the declarations of Cynthia Iwuoha, Damon Arnold, and Luam Teckle, and the deposition testimony of Plaintiff Sweeney Montinola. Plaintiff Damon Arnold stated: "I heard a noise and thought I had been shot. I could see the cloud of smoke and found myself grasping for air." Plaintiff Cynthia Iwuoha stated she saw "police officers in gas masks charging upstairs." Plaintiff Luam Tekle stated he "saw something fly up the stairs." Plaintiff Sweeney Montinola testified that he saw an object, the size or shape of a coke can, with smoke coming out it on the stairs, outside the building.

Plaintiffs also contend the officers refused to help those individuals who were injured. Leah Henry-Sheppard's declaration states she saw her friend "Nicole" lying unconscious on the ground surrounded by four police officers who refused to help Nicole and prevented anyone from touching her. When Ms. Henry-Sheppard tried

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 16

to get the officers' attention, they told her to "get the f***
away."  Celena Gonsalvez also reported that the officers didn't
provide any assistance to the injured people.  Plaintiff Shikita
Trahan stated she saw a girl fall down at the door way on the way
out of the building and when Ms. Trahan tried to wake the girl up,
the officers to her to "[m]ove out of the way, leave her alone."
Plaintiff Damon Arnold's declaration states he saw a woman lying on
the ground, not breathing, "while the officers just stood around."
When Plaintiff Luam Tekle got outside he witnessed the police
officers "laughing".  Plaintiff Willie Brent also stated the
officers appeared pleased with themselves and had a "smile of
success" on their faces.

**III. SUMMARY JUDGMENT STANDARD**

A moving party is entitled to summary judgment when there are
no genuine issues of material fact in dispute and the moving party
is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56;
*Celotex Corp. v. Catrett*, 477 U.S. 316, 323, 106 S.Ct. 2548, 2552
(1986).  "A material issue of fact is one that affects the outcome
of the litigation and requires a trial to resolve the parties'
differing versions of the truth."  *S.E.C. v. Seaboard Corp.*, 677
F.2d 1301, 1306 (9th Cir. 1982).  Inferences drawn from facts are to
be viewed in the light most favorable to the non-moving party, but
the non-moving party must do more than show that there is some
"metaphysical doubt" as to the material facts.  *Matsushita Elec.
Indus. Co. v. Zenith Radio*, 475 U.S. 572, 586-87, 106 S.Ct. 1348,
1356 (1986).  There is no issue for trial "unless there is

sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986).  A mere "scintilla of evidence" in support of the non-moving party's position is insufficient to defeat a motion for summary judgment.  *Id.* at 252, 106 S.Ct. at 2512.  The non-moving party cannot rely on conclusory allegations alone to create an issue of material fact.  *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).  Rather, the non-moving party must present admissible evidence showing there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); *Brinson v. Linda Rose Joint Venture*, 53 f.3d 1044, 1049 (9th Cir. 1995).  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.  "If the evidence is merely colorable...or is not significantly probative,...summary judgment may be granted."  *Id.* at 249-50, 106 S.Ct. at 2511 (citations omitted).

**IV.  ANALYSIS**

Plaintiffs' Complaints allege Defendants are liable under 42 U.S.C. § 1983 for violating Plaintiffs' constitutional rights under the Fourth, Eighth, and Fourteenth Amendments.  Plaintiffs claim they had a "federally-protected interest in life and liberty, including freedom from unlawful and excessive use of police force, as well as procedural and substantive due process of law."  Complaint, ¶ 6.1.  Plaintiffs also assert a claim for racial discrimination.  *Id.*  The individually named defendants, officers of

the City of Pullman Police Department ("Defendant Officers") move for partial summary judgment on qualified immunity with respect to the excessive force claim.

"Qualified immunity is an entitlement not to stand trial or face the burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (citations and internal quotations omitted). The Supreme Court has established a two-part analysis for determining whether qualified immunity is appropriate in a suit against an officer. When confronted with a claim of qualified immunity, the Court must first ask the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a plaintiff's constitutional right?" *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156. If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* On the other hand, if a violation of a constitutional right could be made on a favorable view of the plaintiff's allegations, the next question the Court must ask is "whether the right was clearly established. This inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* As to this second inquiry, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156-57.

**A.    *Have Plaintiffs Raised Issues of Fact Which Would Establish Constitutional Violations?***

The critical inquiry in a § 1983 suit "is whether the plaintiff has been deprived of a right secured by the Constitution and the laws." *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). Here, Plaintiffs assert a claim for excessive force in violation of their rights under the Fourth, Eighth, and Fourteenth Amendments. "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 1228 n. 7, 137 L.Ed.2d 432 (1997). Therefore, the threshold determination is whether Plaintiffs' excessive force claims are covered by the Fourth Amendment or Eighth Amendment.

**1.    Eighth Amendment**

Plaintiffs contend some of them may have a claim under the Eighth Amendment if discovery later reveals they have criminal histories or were on probation at the time of the incident. However, neither Plaintiffs' criminal history nor probation status are relevant in determining whether their Eighth Amendment rights were violated because the Eighth Amendment's protections do not attach until after conviction and sentence. *Graham v. Connor*, 490 U.S. 386, 393 n. 6, 109 S.Ct. 1865, 1870 n. 6, 104 L.Ed.2d 443

(1989).  Therefore, because none of the Plaintiffs were incarcerated prisoners at the time of incident, their complaints of excessive force cannot arise under the Eighth Amendment.  Accordingly, the Plaintiffs' claims under the Eighth Amendment are dismissed with prejudice.

### 2.   **Fourth Amendment**

The Fourth Amendment only protects against unreasonable "searches" and "seizures."  *County of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998).  Neither party suggests there was a search in this case.  Therefore, to assert a successful excessive force claim under the Fourth Amendment, Plaintiffs must first show they were "seized" within the meaning of the Fourth Amendment.

"A seizure triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen[.]" *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10 (internal citations and quotations omitted).  "Violation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989).  "[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing

felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower*, 489 U.S. at 596, 109 S.Ct. at 1381 (emphasis in original).  To constitute a seizure, "the taking or detention itself must be willful.  This is implicit in the word 'seizure,' which can hardly be applied to an unknowing act." *Id.* (internal quotations omitted).

With respect to determining whether the Plaintiffs were "seized" within the meaning of the Fourth Amendment, the Court determines there are two subsets of plaintiffs:  (1) those on the first floor or second floor who were never sprayed directly with O.C. but experienced secondary effects; and (2) those on the first floor who were sprayed directly with O.C.

Plaintiff have not presented the Court with any evidence that the Defendant Officers intentionally dispersed O.C. on the second floor.  Although the O.C. immediately diffused through the building, exposing those who were upstairs on the dance floor as well as those who remained on the first floor, Plaintiffs have not submitted any evidence showing the Defendant Officers intended to effect those individuals who were not sprayed directly.  Therefore, since none of the Plaintiffs who suffered secondary exposure from the O.C. on the first or second floor were the deliberate and intended object of the Defendant Officers' use of O.C., they were not "seized" within the meaning of the Fourth Amendment.[6]  *See Brower*, 489 U.S. at 596, 109

---

[6] The Court rejects Plaintiffs' argument that the Defendant Officers effectively seized everyone in the building by deliberately trying to keep people inside the building.  Since "a

S.Ct. at 1381.  Therefore, the Plaintiffs who suffered secondary exposure may only pursue excessive force claims under the substantive due process clause of the Fourteenth Amendment.  *See Lewis*, 533 U.S. 833, 118 S.Ct. 1708.  However, the Plaintiffs on the first floor who were intentionally sprayed with O.C. were seized within the meaning of the Fourth Amendment because the Defendant Officers dispersed O.C. in an attempt to gain physical control over those individuals.  Therefore, those Plaintiffs may pursue their excessive force claims under the Fourth Amendment.

### a.  *Framework For Analyzing Excessive Force Claim*

When analyzing Plaintiffs' Fourth Amendment excessive force claim, the Court must determine whether the Defendant Officers' use of force was "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intention or motivation."  *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872 (citations and internal quotations omitted).  Whether the force used was objectively reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

---

person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave", *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), the Court concludes the Defendant Officers did not effectively seized everyone in the building because Plaintiffs have not alleged they were not free to leave, only that the chaos and the effects of the pepper spray made it difficult to get out of the building.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 23

vision of hindsight." *Id.* at 396, 109 S.Ct. at 1872 (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 109 S.Ct. at 1872.

Plaintiffs argue the Defendant Officers should have used alternative measures before dispersing pepper spray. Specifically, Plaintiffs argue the Defendant Officers should have turned on their sirens while approaching the Top of China and that they should have shouted their presence and issued commands to the plaintiffs before dispersing pepper spray. However, the appropriate inquiry is whether the Defendant Officers acted reasonably, not whether they had less intrusive alternatives available. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see e.g., Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-57 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976). Officers need not avail themselves of the least intrusive means of responding to a situation; they need only act within that range of conduct identified as reasonable. *Scott*, 39 F.3d at 915. While the Court may not consider the fact that less intrusive alternatives were available, the Court may consider whether the Defendant Officers' failure to take steps prior to the use of O.C. was clearly

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 24

unreasonable.

The reasonableness of the force is determined by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871. In evaluating the nature and quality of the use of force and consequential intrusion on the Plaintiffs, the Court must consider "the type and amount of force inflicted." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Next, the Court measures the governmental interests at stake by evaluating the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871. These factors are a means by which the Court determines objectively the amount of force that is necessary in a particular situation. The key issue is the need for force: "[t]he *force* which was applied must be balanced against the *need* for that force: it is *the need for force* which is at the *heart* of the *Graham* factors." *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000), *vacated and remanded on other grounds*, County of Humboldt v. Headwaters Forest *Defense*, 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001) (citing *Liston*, 120 F.3d at 976 (quoting *Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994) (emphasis in original). Thus, where

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 25

there is no need for force, *any* force used is constitutionally unreasonable. *See P.B. v. Kock*, 96 F.3d 1298, 1303-04 & n. 4 (9th Cir. 1996).

### i.   Nature and Quality of Intrusion

Here, Plaintiffs allege the Defendant Officers opened the door to the building and sprayed a continuous stream of O.C. toward the group of individuals who were fighting.  The Plaintiffs further allege the Defendant Officers sprayed a continuous stream of O.C. as they walked toward the stairs leading to the second floor.  Some of the male plaintiffs who were sprayed directly with pepper spray were handcuffed and remained inside the building for 20-30 minutes before they were escorted outside by a police officer.  The Plaintiffs testified they suffered burning of the eyes and nose, difficulty breathing, and vomiting.  Furthermore, the Plaintiffs allege facts, which viewed in the light most favorable to the Plaintiffs, support the argument that O.C. was not the only chemical used by the Defendant Officers.

The Ninth Circuit has held that the intrusion caused by pepper spray is certainly "more than minimal." *Headwaters Forest Defense*, 240 F.3d at 1200.  Pepper spray is a "dangerous weapon" under the criminal sentencing guidelines because it is "capable of inflicting death or serious bodily injury." *United States v. Neil*, 166 F.3d 943, 949 (9th Cir.), *cert denied*, 526 U.S. 1153, 119 S.Ct. 2037, 143 L.Ed.2d 1046 (1999).  Even if the Court only considers the Defendant

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 26

Officers' use of O.C., and not Plaintiffs' allegations that the Defendant Officers used other chemical forces in addition to O.C., the use of force employed was substantial, considering the pain, irritation, swelling, and difficulty breathing that the O.C. caused. Thus, the Defendant Officers also needed a strong interest to warrant the use of O.C. within the building.

### ii.  Governmental Interests at Stake

In *Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001), the Ninth Circuit held that the use of pepper spray did not constitute excessive force when it was used to subdue and arrest a non-compliant citizen attempting to directly interfere with the officers' attempt to maintain order.  268 F.3d 646.  In *Jackson*, the governmental interest began with an attempt to arrest the plaintiff's son (Blake) on an outstanding felony warrant.  *Id.* at 652.  As Blake fled, the "officers, who were substantially outnumbered, were faced with a group that refused to obey the officers' commands to disperse; that shouted at the officers; and that engaged the officers in verbal and physical altercations."  *Id.* at 652-53.  "The safety interest in controlling the group increased further when the group was warned by the police that chemical irritant would be used if they did not move back from the area, and the group refused to comply."  *Id.* at 653.  The plaintiff, who also chose to ignore the officers' warning, was sprayed with pepper spray after she directly interfered one officer's attempt to maintain

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 27

order.  *Id.*  The Ninth Circuit held that the plaintiff's "active interference posed an immediate threat to the officers' personal safety and ability to control the group."  *Id.*  Under those circumstances, the court held that the force applied was reasonable and necessary to control a "rapidly evolving and escalating situation."  *Id.*

In contrast to *Jackson*, here no strong governmental interests were at stake before the Defendant Officers sprayed O.C. without warning.  First, the character of the offense was minor.  Unlike *Jackson*, where the officers arrived on scene to make an arrest, the Defendant Officers were called to the scene to break up a fight.  Second, the record before the Court does not reveal any articulable basis for believing the risk to the Defendant Officers' safety or their ability to control the group was high.  Although the Defendant Officers were confronted with a group of individuals engaged in a physical fight, at no time before the Defendant Officers sprayed O.C. did any of the Plaintiffs make any advance toward an officer. Further, the Plaintiffs were never given an opportunity to comply with the Officers' demands because the Defendant Officers never announced their presence or attempted to gain control of the group before using O.C.  Furthermore, Plaintiff Shikita Trahan stated the officers were spraying in a constant stream into the air as they moved into the building and toward the stairs, not at any one particular person.  Moreover, the Defendant Officers never issued

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 28

any type of warning that a chemical irritant such as O.C. was going to be used on the Plaintiffs.  The third *Graham* factor, risk of flight, also weighs in favor of the Plaintiffs.  Unlike *Jackson*, the Plaintiffs in this case were not forcibly resisting arrest or interfering with an officer's attempt to make an arrest.

On balance, after evaluating the *Graham* factors, the Court determines the Defendant Officers' use of O.C. spray against the Plaintiffs under these circumstances was excessive.  Conclusory statements of an officers' concern for his safety do not establish a strong governmental interest justifying the use of force.  *See Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), cert denied, 536 U.S. 958, 122 S.ct. 2260, 153 L.Ed.2d 835 (2002).  Instead, objective factors must support the concern.  However, here, the Defendant Officers did not articulate a "need" for their use of O.C.  *See Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994) (holding that the force applied must be balanced against the *need* for that force because it is the need for force which is at the heart of the consideration of the *Graham* factors).  Since the use of O.C. was excessive under the circumstance, the use of any other chemical force would also be excessive.

## 2.   Fourteenth Amendment

As discussed above, the Plaintiffs who suffered secondary exposure from the pepper spray and who were not intentionally sprayed may only pursue excessive force claims under the substantive

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 29

due process clause of the Fourteenth Amendment.[7]  The Fourteenth

Amendment protects against the government's interference with "an

individual's bodily integrity." *Armendariz v. Penman*, 75 F.3d 1311,

1319 (9th Cir. 1996) (en banc) (citing *Rochin v. California*, 342

U.S. 165, 172, 72 S.Ct. 205, 209-10, 96 L.Ed. 183 (1952).  The

threshold standard for judging a substantive due process claim is

whether the challenged governmental action is "so egregious, so

outrageous, that it may fairly be said to shock the contemporary

conscience." *Lewis*, 523 U.S. at 847 n. 8, 118 S.Ct. at 1717.  As

the Supreme Court has recognized, "the measure of what is conscience

shocking is no calibrated yard stick...." *Id.* at 847, 118 S.Ct. at

1717.  What shocks the conscience in one situation may not shock the

conscience in another.  *Id.* at 850, 118 S.Ct. at 1718-19.  At one

end of the culpability spectrum is mere negligence, which is never

sufficient to establish a constitutional violation.  *Id.* at 849, 118

S.Ct. at 1718.  At the other end of the spectrum, "conduct intended

to injure in some way unjustifiable by any government interest is

---

[7] Contrary to Plaintiffs' claims, *Graham v. Connor*, 490 U.S.
386, 394, 109 S.Ct. 1865, 1870-71, 104 L.Ed.2d 443 (1989), does
not hold that all constitutional claims related to police conduct
must arise under the Fourth or Eighth Amendments; rather, *"Graham*
simply requires that if a constitutional claim is covered by a
specific constitutional provision such as the Fourth or Eighth
Amendment, the claim must be analyzed under the standard
appropriate to that specific provision, not under the rubric of
substantive due process." *Lewis*, 523 U.S. at 843, 118 S.Ct. at
1715 (citations and quotations omitted).  Thus, the substantive
due process analysis remains appropriate for those Plaintiffs'
claims that are not covered by the Fourth Amendment.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 30

the sort of official action most likely to rise to the conscience-shocking level." *Id.* (quotation omitted). "Whether the point of conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Id.* (citations and quotations omitted). Whether conduct falling within this "middle range" reaches the level of conscience shocking depends on the facts and circumstances of each individual case. *Lewis*, 523 U.S. at 851, 118 S.Ct. at 1719.

For example, in the context of a pretrial detention, the culpability requirement for a due process violation may be satisfied by showing the officials were deliberately indifferent to the needs of the detainees. *Id.; but cf. Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (holding that "deliberate indifference" is insufficient to show officer liability in a prison riot because in those circumstances liability should turn on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."). However, deliberate indifference is insufficient to satisfy the culpability requirement applicable to substantive due process claims arising from the unintentional killing of an individual by law enforcement officers during a high-speed chase. *See Lewis*, 523 U.S. 833, 118 S.ct. 1708.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 31

Specifically, the Court in *Lewis* held that in light of the
unforeseen circumstances demanding the officer's instant judgment in
a pursuit case, demonstration of actual "purpose to cause harm
unrelated to the legitimate object of arrest" was necessary to
"satisfy the element of arbitrary conduct shocking to the
conscience, necessary for a due process violation."  523 U.S. at
836, 118 S.Ct. at 1711-12.

Although the Supreme Court limited its holding in *Lewis* to the
facts of that case, (i.e. high-speed police chases), the Ninth
Circuit extended the *Lewis* explanation of "shocks the conscience" to
"cases where it is alleged that an officer inadvertently harmed a
bystander while responding to a situation in which the officer was
required to act quickly to prevent an individual from threatening
the lives of others."  *Moreland v. Las Vegas Metropolitan Police
Dep't.*, 159 F.3d 365, 372, 373 (9th Cir. 1998) (holding that the
defendant police officers did not violate the plaintiffs'
substantive due process rights to family association when the
officers accidentally shot and killed the decedent "because the
officers were responding to the extreme emergency of public gunfire
and did not intend to commit any harm unrelated to the legitimate
use of force necessary to protect the public and themselves").

Here, the Court must first determine whether is should analyze
the Defendant Officers' conduct under a "deliberate indifference"
standard or *Lewis*' "purpose to commit harm" standard.  There is no

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 32

Ninth Circuit case law directly on point, but "the critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Moreland*, 159 F.3d at 373 (reviewing the circuits' treatment of *Lewis*). As the *Lewis* Court explained, the deliberate indifference standards is "sensibly employed only when actual deliberation is practical." *Lewis*, 523 U.S. at 851, 118 S.Ct. at 1719 (contrasting the actual deliberation which is possible in the custodial situation of a prison with respect deliberate policy decisions relating to those matters that affect an inmate's general well-being, such as medicare care, proper exercise, and adequate nutrition, with decisions that prison officials must made during a riot). Deliberate indifference does not suffice for constitutional liability under the Eighth Amendment "when a prisoner's claim arises not from normal custody but from response to a violent disturbance." *Id*.

Here, the Defendant Officers certainly weren't facing the "extreme emergency of public gunfire" like the officers faced in *Moreland*. Therefore, arguably, the Defendant Officers had time to deliberate about how they were going to break up the fight before opening the door and spraying O.C. However, in *Lewis*, the Supreme Court held that actual deliberation was not practical where the defendant officer, driving a patrol car, was simply pursuing a motorcyclist in a high-speed chase whose only offense was speeding.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 33

Further, the concerns of the Defendant Officers at the time of the incident were similar to those concerns of officers involved in dispersing a prison riot.  Therefore, since "deliberate indifference" was insufficient to show officer liability in both a prison riot and a high-speed chase of a motorcyclist who was speeding, the Court concludes that it is also insufficient to show officer liability in a situation such as that confronted by the Defendant Officers in this case.  Consequently, the Court concludes that actual "purpose to cause harm" unrelated to any legitimate use of O.C. must be shown to satisfy the "shocks the conscience" standard necessary for a due process violation in this case.

The Defendant Officers' use of O.C. inside the Top of China Restaurant and the fact that it dispersed throughout the building and affected the individuals inside does not meet the "purpose to cause harm" standard.[8]  However, Plaintiffs have produced evidence that if proven, is adequate to meet this standard.  Specifically, Plaintiffs allege the Defendant Officers refused to provide assistance to the injured Plaintiffs, refused to allow the Plaintiffs to assist one another, and tried to keep the Plaintiffs

---

[8] Since the Court determines the Defendant Officers' use of O.C. in this case does not evidence a purpose to cause harm sufficient to satisfy the shocks the conscience standard necessary for a substantive due process violation, the Court does not consider, under the second prong of the *Saucier* analysis, whether the Plaintiffs' right to be free from secondary exposure to O.C. was clearly established.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 34

from exiting the building after O.C. was sprayed.[9]  If proven, these facts evidence a purpose to cause harm against all of the Plaintiffs unrelated to any legitimate use of force by the Defendant Officers, thereby satisfying the "shocks the conscience" standard necessary for a substantive due process violation in this case.

**B.   *Were the Plaintiffs' Fourth and Fourteenth Amendment Rights Clearly Established?***

"The second part of the *Saucier* analysis asks whether the plaintiff's constitutional right was clearly established at the time of the injury." *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 780-

---

[9] Leah Henry-Sheppard's declaration states that she saw her friend "Nicole" lying unconscious on the ground surrounded by four police officers who refused to help Nicole and prevented anyone from touching her.  When Ms. Henry-Sheppard tried to get the officers' attention, they told her to "get the f*** away."  Plaintiff Shikita Trahan stated she saw a girl fall down at the door way on the way out of the building and when Ms. Trahan tried to wake the girl up, the officers to her to "[m]ove out of the way, leave her alone."   Plaintiff Damon Arnold's declaration states that he saw a woman lying on the ground, not breathing, "while the officers just stood around."  When Plaintiff Luam Tekle got outside he witnessed the police officers "laughing".  Plaintiff Willie Brent also stated that the officers appeared pleased with themselves and had a "smile of success" on their faces.  Celena Gonsalves stated "the police officers shut off and blocked the way I was going and I had to turn around.  I was one of the last persons to get out for fresh air."  Plaintiff Willie Brent stated some of the officers were "suggesting" that people stay inside.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 35

81.  The Court asks "whether the officers acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed...after the fact."  *Hunter*, 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).  "In other words, an officer who makes a reasonable mistake as to what the law requires under a given set of circumstances is entitled to the immunity defense."  *Boyd*, 374 F.3d at 781 (citation omitted).  Here, if the law did not put the Defendant Officers on notice their actions would be clearly unlawful, summary judgment based on qualified immunity is proper.  *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156.

The Court begins this inquiry by looking to binding precedent. *Boyd*, 374 F.3d at 781.  In the absence of binding precedent, the Court looks to whatever law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts.  *Id.*  Neither party can point the Court to controlling case law in the United States Supreme Court or this Circuit dealing with the use of pepper spray under the circumstances confronted by the Defendant Officers.  However, the parties point the Court to a handful of relevant cases, which certainly define some of the acceptable limits of the use of pepper spray.  Specifically, Plaintiffs point the Court to *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000); *Headwaters Forest Defense v. County*

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 36

*of Humboldt*, 276 F.3d 1125 (9th Cir. 2002), *cert denied*, *County of Humboldt v. Burton*, 537 U.S. 1000, 123 S.Ct. 513, 154 L.Ed.2d 394 (2002); *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004); *Park v. Shiflett*, 250 F.3d 843, (4th Cir. 2001); and *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994).[10]  The Defendant Officers point the Court to *Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001).

In *LaLonde*, the Ninth Circuit denied qualified immunity to the defendant police officers who left pepper spray on the plaintiff's face and in his eyes for twenty to thirty minutes after he had already surrendered and was under control.  204 F.3d at 960.  During this time, the plaintiff was seated and handcuffed and although the officers observed the effects of the pepper spray on the plaintiff, they refused to offer him any assistance.  *Id.*  The Ninth Circuit held that the use of pepper spray "may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force."  *Id.* at 961.

*Headwaters* involved three different nonviolent protests where

---

[10] *Adams* and *Parke* involve completely different facts than those present before the Court in this case and cannot be said to have put the Defendant Officers on notice that their conduct was "clearly unlawful."

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 37

the plaintiffs linked themselves together in metal shackles around an ancient redwood tree to protest its removal.  276 F.3d at 1127. In the each protest, the officers first warned the nonviolent protesters that pepper spray would be used if they did not release. *Id.* at 1128.  In the first protest, after the protesters refused to release, the officers forced back the protestors' heads and applied pepper spray with a Q-tip to the corners of their closed eyes, and then reapplied the pepper spray with Q-tipes to their eyelids.  *Id.* In the second and third protest, the officers sprayed pepper spray directly on the faces of the protestors.  *Id.* at 1129.  The Ninth Circuit held that the use of pepper spray against the nonviolent protesters who were sitting peacefully and did not threaten the officers constituted excessive force under the circumstances because (1) it was unnecessary to subdue, remove, or arrest the protestors; (2) the officers could have safely and quickly removed the protectors, while in the shackles, from the protest site; and (3) the officers could have removed the shackles with an electric grinder in a matter of minutes and without causing pain or injury to the protestors.  *Id.* at 1130-31.  The Ninth Circuit further held that "[b]ecause the officers had control over the protestors, it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control...and that the manner in which the officers used the pepper spray [i.e. blasts of pepper spray within inches of the face and Q-tip application] was unreasonable."  *Id.* at 1130.  In light of its prior

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 38

holding in *LaLonde*, the Ninth Circuit concluded that it also would
have been clear to any reasonable officer that the officers' refusal
to wash out the protestors' eyes with water constituted excessive
force under the circumstances. *Id.* In two of the protests,
officers threatened that they would not provide the protestors with
water to wash out their eyes until they released themselves, and in
one of the protests, the officers did not provide the protestors
with water for over twenty minutes. *Id.* at 1131. Consequently,
the *Headwaters* Court held that the officers were not entitled to
qualified immunity.

Plaintiffs rely primarily on *Boyd v. Benton County*, 374 F.3d
773 (9th Cir. 2004) in arguing that the Defendant Officers' actions
were clearly unlawful. In *Boyd*, the Ninth Circuit held the officers
used excessive force when, without considering alternatives and
without warning to the occupants, blindly threw a flash-bang grenade
into an apartment while executing a search warrant. 374 F.3d at
779. When the officers executed the search warrant, they had
information leading them to believe that up to eight people, in
addition to the robbery suspect, may have been sleeping within the
apartment, and that the suspect could have a gun. *Id.* Prior to
executing the search, the officers conducted surveillance of the
apartment and planning their execution of the search warrant and use
of the flash-bang device to gain entry and secure the premises. *Id.*
at 777. Although the officers used excessive force, the court found

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 39

they were entitled to qualified immunity under the second part of the *Saucier* analysis because at that time, the plaintiff's Fourth Amendment right to be free from dangerous flash-bang devices under these circumstances was not clearly established. *Id.* at 784.

The Defendant Officers rely on *Jackson* to argue that the Plaintiffs have not shown that the Officers' use of force was clearly unlawful under the circumstances. In *Jackson*, officers attempted to arrest Jackson but friends of family interfered in an effort to prevent the arrest. 268 F.3d at 650. The group shouted at the officers and engaged the officers in verbal and physical altercations. *Id.* at 652-53. There were as many as fifty friends and family in the park but it is unclear how many fought with the police. *Id.* at 650. Jackson was sprayed with pepper spray when she directly interfered with the officers' attempt to maintain order after the officers had warned they would use a chemical irritant if the group did not disperse. *Id.* Jackson was then arrested and placed in the back of a hot patrol car with the windows rolled up to "adjust [her] attitude." *Id.* Chemical irritant ran into her eyes and ears before officers sprayed her with water. *Id.* Under the circumstances, the *Jackson* Court held that the force was not excessive after balancing the minimal intrusion (irritant in hair and face) against the government's safety interest in controlling the large group that outnumbered the police and that were not obeying commands to disperse. *Id.* at 652-53. Specifically, the

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 40

court found that the use of force was reasonable and necessary to control a "rapidly evolving and escalating situation." *Id.* at 653 (citations and quotations omitted). Because the court held that no Fourth Amendment violation occurred, it did not consider the second step of the qualified immunity inquiry.

### 1. **Fourth Amendment**

In conclusion, under the second prong of the *Saucier* analysis, the Court determines the law was clearly established such that a reasonable officer would know the conduct alleged violated the Fourth Amendment rights of those Plaintiffs who were sprayed directly with O.C. Although there is no case law directly on point with respect to the factual circumstances of this case, "it is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness was apparent in light of existing law." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060-61 (9th Cir. 2003)(citations omitted). As the Ninth Circuit has noted, "a law can be violated notwithstanding the absence of direct precedent otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Headwaters*, 276 F.3d at 1131 (citations and quotations omitted). In light of the existing law, the Court determines it would be clear to a reasonable officer that the use of O.C. must be preceded by a warning when the officer's safety is not

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 41

threatened and the officer is not trying to overcome resistance to arrest.  Further, in light of *LaLonde* and *Headwaters*, a reasonable officer would know he has an obligation to render assistance after using O.C. and alleviate the symptoms of those individuals who were affected by the O.C.  If the facts alleged by Plaintiffs are proven, the Defendant Officers used O.C. in a situation where a reasonable officer would have known it was clearly unlawful and did not render the necessary assistance they were obligated to provide under the Fourth Amendment.  Accordingly, the Defendant Officers are denied qualified immunity with respect to Plaintiffs' Fourth Amendment claims.

### 2.   Fourteenth Amendment

In conclusion, under the second prong of the *Saucier* analysis, the Court determines the law was clearly established such that a reasonable officer would know (1) his refusal to assist and calm individuals who were suffering from affects of O.C.; (2) taking efforts to keep individuals inside a building where O.C. was sprayed; and (3) preventing others from helping those individuals harmed by the O.C. would result in a violation of the individuals' Fourteenth Amendment rights.  Accordingly, the Defendant Officers are not entitled to qualified immunity with respect to the Plaintiffs' Fourteenth Amendment claims.

**IT IS HEREBY ORDERED:**

1.   The Defendants' Motion for Partial Summary Judgment Re:

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 42

Qualified Immunity, **Ct. Rec. 55,** is **GRANTED IN PART AND DENIED IN PART** to the extent indicated in this Order.

    **IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this Order and furnish copies to counsel.

    **DATED** this <u>4th</u> day of October, 2005.

<u>    s/ Fred Van Sickle    </u><br>
Fred Van Sickle<br>
United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL
SUMMARY JUDGMENT RE: QUALIFIED IMMUNITY - 43